24-3147 C.B. Gloria D. Dickerson v. BPP PCV Owners LLC We'll allow everybody a minute to come up and get settled at the council table. And we'll let everybody else file out of the room so that way it's quiet and we can listen to all the parties without any distractions. And Ms. Dickerson, please feel free to keep your mask on if that makes you more comfortable. But if you could lean in, we want to make sure we can hear you well. Right, I do have to keep it on. Thank you. Yeah, so Ms. Dickerson, whenever you're ready, I understand you would like to reserve two minutes for rebuttal. And you've seen how the other lawyers did it, so we now give you three minutes up front. And because you're the appellant, after we hear from your adversary, you would be the last one. So you get to be the first one and you get to be the last one to argue. Does that make sense? Yes. Okay, so Ms. Dickerson, please let us know what you would like to say. Good morning. I'm sorry. I was trying to learn from the attorneys what I'm supposed to say at the very beginning. But thank you for the opportunity to be here this morning. I'm here as a resident of New York City for about the past 33 years and have lived at 7 Peter Cooper Road since 1992. I knew nothing about Peter Cooper, Stuyvesant Town until my husband, who was the head of the United Way of New York City when we moved here in 1988, happened to be sitting in a meeting with the chairman of MetLife, who asked him if we know anything about Peter Cooper Village, Stuyvesant Town. And we did not know about Peter Cooper, Stuyvesant Town. My husband asked me, former husband, I must say, and he is also deceased now, unfortunately, but asked me if I'd be interested in taking a look. I said, why not? We're new to New York. I lived in Illinois, Missouri, Wisconsin, Ohio, Pennsylvania, New York. As we moved around the country with his job with the United Way. So I visited Peter Cooper and said, oh, whoopee, this is nice. Didn't know this existed in the city, but then I didn't know much about the city. So I said, yes, let's take a look at it and see what we need to do. So as it happens, we did go ahead and take an apartment at Peter Cooper Village. As a matter of fact, 7 Peter Cooper Road. Have been there ever since that time. And have enjoyed my neighbors because I'm not a city girl. Was not born and raised in a city, but don't want to leave the city now. I love it. Here alone now. Husband is deceased, former husband. Family lives out of town. My only son. Lost my daughter in 1994. She perished in a plane crash. So I'm in New York alone as far as family goes. But have lots of friends. Have lots of neighbors. Whom I love. And very close to. And I respect the fact that they are. I am using my time and I don't. I'm so sorry. Why don't you take an extra minute right now. I'm so sorry. No, that's fine, that's fine. You're not going to give up the two minutes at the end. But why don't we take an extra minute right now and just talk about the case.  No, it's okay. It's okay. On November. In November of 2020. Resigning for 30 years at 7 Peter Cooper Road. I had. One of the security. Public safety officers to knock on my door. As I was sitting, listening to the morning news during the pandemic. Knock on my door and say that. Not ask me, but tell me. Mrs. Dickerson, we have you captured on the security cameras. We need for you to return it. And if you do not do so, we will call the police. I said. I don't know what you're talking about. I have not removed the cabinet. They said. If you don't return it. We'll call the police. He called dispatch and said. Confirmed. 7 Peter Cooper roads. Dispatcher says yes. I said, I don't know what you're talking about. I was panicking at that point. And I closed the door. And I ran and got clothes on because I just had my pajamas on. I ran and got my clothes on. So that I could get downstairs because. They were calling the police on me and I was afraid. To be in my apartment alone and have police to approach me. To ask me about something I didn't do. Concerned about. Potentially being shot. I ran to the front. In the lobby where my neighbors would be passing. And I would have cameras and feel safe. I've told the story in my brief. We can assure you. We actually have. I want to thank you for submitting your brief. Before we come on the bench. We've all read it. So we're very familiar with the facts and I understand it may be. Difficult for you to talk through them all again. I can assure you there. There's no need for you to. Go through all the facts for us because we do have them on paper. So. Well, we have those facts. I don't feel like you need to go through them again. I know that may feel difficult to do that. So am I to stop now? Well, why don't we do this? Why don't you sit down for a second? Why don't we hear what the lawyer on the other side has to say? Okay. And then when you come back. We're going to give you a couple more minutes to talk. Listen to what the other lawyer has to say. And then if there's something you want to talk about about why. You want the court to rule one way or the other. That's probably the best thing to talk about is. Again, we've read the briefs. We know the facts. So don't worry about needing to tell us again. We've read them. We know them. But think about it more in terms of why you think we should rule one way or the other. Does that make sense? Yes, it does. Okay. So why don't we hear from Mr. Parada for the appellate. Good morning, Your Honor. May it please the court. Michael Parada from Leidecker for the respondent. Not every insult has a legal recourse. And this is a textbook example of that principle. The respondent is very sorry about what happened and apologizes for the plaintiff, but she's not stated a claim for which relief can be granted. Regardless of what protected classes the plaintiff may be a member of or the fact that she may have submitted a complaint, the insult that she suffered was not related to a protected class or a complaint, at least not that she's articulated in the three times that she had to draft a complaint. As for the constitutional claims, she has to claim that a state entity was involved and she has not done so as explained by the court in the first opinion. Other than that, I really don't have anything to add. And I thank you for your time. That's fine. We have your briefs as well. We've read them. So we're also familiar with that. So thank you very much, Mr. Parada. Thank you. Ms. Dickerson, we're happy if there's something you'd like to add that's maybe beyond what's already in your briefs or if you have any additional thoughts based on what you've heard Mr. Parada say. This is the first time that I've heard an apology at all, quite frankly. They did not apologize to me at all. This is the first time I've heard it come out of its mouth. As a matter of fact, on March 8, 2022, I have a voicemail from Mr. Parada and I did request that it be played. Well, I wasn't, Ms. Dickerson, that came after the case was ruled upon, I think? No. But it came before? Yes. Okay. It came before. And we have the transcript that you gave to us. Well, the audio that I requested in the motion had been presented to the lower court already. All of that, you heard it. Good, good. But I want to repeat it today so that you can understand that on March 8, 2022, voicemail from Michael Parada, defendant's attorney to Gloria D. Dickerson. Hello. This is verbatim. Hello. This is a message for Gloria Dickerson. This is Michael Parada calling from the law firm Leidecker. We represent Peter Cooper Village in the case that you filed against BPP PCV owners LLC. Defendants were able to get insurance on the claim. And so the insurance company wants to know if there's an amount of money that you are seeking. And if you want to let me know, my phone number is 908-432-4098. Thank you. This is verbatim on March 8th. Acknowledging that something wrong happened and offering me money and wanting to know how much I wanted. When I told them I wanted a refund for my rent for the 30 years that I'd been there for the disrespect and the total abuse that they showed to me, then it got nasty on their part. So, Ms. Dickerson, listen, we don't get involved in settlement negotiations or anything like that. What we will look at is everything you told us about the incident. That's what's before us. Well, where I believe and am concerned that an error was made by the judge is that the fact that this happened to me as a senior, a resident there for 30 years, I have a disability. The fact that it happened, just like with what is happening today with ICE knocking on doors and doing what they're doing to undocumented immigrants. Peter Cooper, the landlord, had its public safety officer knock on my door and accuse me and confirm it, that they have me identified, captured on camera, removing a cabinet that I knew nothing about and telling me that if I did not return that cabinet, they would call the police on me and escalated it to the point where they called the police on me. And I've never had to have the police called on me for anything. And they were wrong to do that to me and they would not have done that to my Caucasian neighbors. Many of them would come and say the same thing, who've been there forever. I get along with my neighbors. They know who I am. I love my neighbors. I have enjoyed living there. Peter Cooper management owners have disturbed my life by coming to me and approaching me the way they did. And to do so, and you can't get an attorney to take on these powerhouses and the money. There's a history at Peter Cooper Village that we know now about discrimination and the problems related to housing in New York City. And we have all that you attach to your record. Thank you for that. But for the record, can I say one more thing? One more thing, because we've given you extra time. I'll give you a little bit more. You know what? And I thank you all so much for giving me that time. But this has been a blessing for me. Because it has emboldened me and I'm determined this isn't over. I was told that I have one more step I can take. And that is the Supreme Court. And that I can draw attention to this and what has happened to me. Because there should be no laws, and there are none, that allow landlords to knock on your door and act like they are state actors, policemen. Try you and convict you for things that should not, that are wrong. So my point is, it's been a blessing either way. I want you to know that. Because I am going the next step. It's not over. Thank you all so much. I truly appreciate it. You don't know. And thank you for coming in today. I know it's very hard to do this when you don't have a lawyer. It's hard to get one to take on Peter Cook, the owners. Hey, I don't need to say it. You understand and I've lived long enough to understand too. That's why I will go the next step. Thank you both for coming in today. We very much appreciate your arguments. Like every case that we heard today, we're not deciding it right now. We will take the cases we see under advisement. And in the future, there will be a written ruling. So thank you all. Can I ask one more thing? Sure. Do either of you know a law? Can you tell me, cite a law that permits the landlord? I might have missed something. Is there something you're aware of in your years of experience that permits the landlord to knock on your door and accuse you of something? So we don't answer questions. The way it works in court is we really just listen. But we don't answer questions. You may have seen the lawyers never ask us any questions in other cases. So we can't do that. But we will have a written ruling. At some point, you'll all hear how the court rules and you can all take it from there.